IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JAYMES ANTHONY STARK,<br><br>          Plaintiff,<br><br>v.<br><br>LEE COUNTY, IOWA; THE STATE OF IOWA; STEVE SPROUL; JEREMY HAMELTON;[1] ZACHARY COPPAGE; DUSTIN YOUNG; and C.J. WRAY,<br><br>          Defendants. | **No. 3:18-cv-00069-RGE-CFB**<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Jaymes Anthony Stark brought this action under 42 U.S.C. § 1983. ECF No. 1. Stark is represented by counsel and has paid the filing fee. *Id.* (noting docket entry). Defendants Lee County, Steve Sproul, Jeremy Hamelton, Zachary Coppage, Dustin Young, and Clint Ray move for summary judgment based on Stark's failure to exhaust administrative remedies. Defs.' Mot. Summ. J., ECF No. 31. Stark resists the motion for summary judgment. Pl's Resist. Defs.' Mot. Summ. J., ECF No. 37. Defendants filed a reply. Defs.' Reply Supp. Mot. Summ. J., ECF No. 40.

For the following reasons, the Court finds summary judgment should be granted in part and denied in part.

## I.    SUMMARY JUDGMENT STANDARD

The Court will grant summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is

---

[1] In his complaint, Stark spells the name of this defendant as "Hamelton" while submissions by Defendants spell his name "Hamilton." The summons and deposition of this defendant use the spelling, "Jeremy Hamelton." Summons 2, ECF No. 8; Pl.'s App. 024, ECF No. 37-3. Consequently, for purposes of this order, the Court uses the spelling "Hamelton."

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *Atkison v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (quoting *Dahl v. Rice Cty.*, 621 F.3d 740, 743 (8th Cir. 2010)).

To avoid an entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To show a fact is genuinely disputed, a party must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The quantum of proof the nonmoving party must produce is not precisely measurable, but it must be enough evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("opponent must do more than simply show that there is some metaphysical doubt as to the material facts"); *Williams v. City of Carl Junction*, 480 F.3d 871, 873 (8th Cir. 2007) ("The nonmoving party 'must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'") (quoting *FDIC v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997)).

On a motion for summary judgment, the Court views all the facts in the light most favorable to the nonmoving party, and it gives that party the benefit of all reasonable inferences possibly drawn from the facts. *Lickteig v. Business Men's Assur. Co. of Am.*, 61 F.3d 579, 583 (8th Cir. 1995).

## II.    SUMMARY OF MATERIAL FACTS

At all relevant times, Sproul, Hamelton, Coppage, Young, and Wray were employed by the Lee County Sheriff's Department. ECF No. 1 ¶¶ 6–10. Lee County is a governmental subdivision of the State of Iowa and operates a sheriff's office and jail. *Id.* ¶ 11.

On June 29, 2016, Stark was in the custody of the Lee County Sheriff. *Id.* ¶ 13. On that day, Lee County Deputy Sheriff Sproul transported Stark to and from a medical appointment in the back seat of Sproul's cruiser without either a lap or shoulder belt. *Id.* ¶¶ 13–14. He was restrained by leg shackles, a belly chain, and handcuffs. *Id.* ¶ 15.

When returning Stark to the Lee County Correctional Center after the medical appointment, Sproul overheard the city police dispatcher advise of an armed robbery in progress at a bank near Sproul's location. Defs.' App. Supp. Mot. Summ. J. at APP. 40, Sproul Dep. 52:17–23, ECF No. 31-2. Sproul responded by driving to the bank location with the intent to observe the crime in process pending approval of the city police department. Sproul Dep. 55:1–56:7, 57:19–58:7, ECF No. 31-2 at APP. 41–42.

While parked near the bank location Sproul saw the robbery suspect flee on foot and begin running across a vacant lot. Sproul Dep. 47:4–9, ECF No. 31-2 at APP. 39. In events that "happened really quick," Sproul followed in his vehicle at approximately 20 to 25 miles per hour. Sproul Dep. 47:23–48:2, ECF No. 31-2 at APP. 39. The robbery suspect turned and discharged a handgun into the car, striking the windshield, radiator, and the driver side door. Sproul Dep. 48:7–25, ECF No. 31-2 at APP. 39. Sproul made a sharp right turn to evade the gunfire

and departed the scene. Sproul Dep. 49:2–15, ECF No. 31-2 at APP. 39. Sproul later returned to the scene. Sproul Dep. 66:1–4, ECF No. 31-2 at APP. 43. Stark was in the back seat throughout these events. *See, generally,* ECF No. 31-2 at APP. 38, 40–43.

Sproul returned Stark to the Lee County Correctional Center shortly thereafter. Pl.'s App. Supp. Resist. Defs.' Mot. Summ. J. at Pl.'s App. 045, Stark Dep. 39:15–17, ECF No. 37-3. Immediately thereafter, Stark began to experience lower back and neck pain. Stark Dep. 40:14–23, ECF No. 37-3 at Pl.'s App. 045–046. He was taken to the hospital for treatment. *See* Stark Dep. 41:10–13, ECF No. 37-3 at Pl.'s App. 046.

The Lee County Sheriff has a written policy concerning transportation of inmates. ECF No. 31-2 at APP. 32–33. Under this policy, inmates "shall be properly restrained." *Id.* at APP. 32. Specifically, "[i]nmates going to medical appointments or when leaving the confines of the jail shall be in restraints. Cuffing is mandatory and additional restraints will be at the officer's discretion." *Id.* at APP. 33. The policy does not specifically refer to seatbelts.

After returning from the hospital, Stark "got into it" with defendants about whether he could make a phone call. Stark Dep. 50:8–11, 51:7–15, ECF No. 37-3 at Pl.'s App. 047. After mentioning that he was going to the media, Defendants responded, "[w]ell, you're not calling anybody, how about that." Stark Dep. 52:20–23, ECF No. 37-3 at Pl.'s App. 048. It is the policy for Lee County Jail to charge inmates for personal calls. Defs.' Suppl. App. Supp. Mot. Summ. J. 3, Stark Dep. 52:24–53:2, ECF No. 40-1. On June 29, 2016, Stark did not have money to make personal phone calls. Stark Dep. 53:3–6, ECF No. 40-1 at 3.

That evening, Stark was kicking on his door and screaming. Stark Dep. 51:19–22, ECF No. 40-1 at 3. Wray, Hamelton, Coppage, and Young came into Stark's jail cell with "gloves on, slammed [Stark] up against the wall, [and] threw [him] in handcuffs." Stark Dep. 50:10–11, ECF No. 37-3 at Pl.'s App. 047; *see also* ECF No. 1 ¶ 23. They also pointed a taser at Stark.

Stark Dep. 51:17–18, ECF No. 37-3 at Pl.'s App. 047–048. Defendants told Stark, "[t]his is none of your business, you don't need to talk about it to nobody, anything that you seen, you know, keep to yourself." Stark Dep. 51:12–15, ECF No. 37-3 at Pl.'s App. 047.

On January 28, 2018, Stark filed a complaint in federal court against Defendants alleging claims about the robbery chase incident and subsequent injuries. *See Stark v. Lee County, Iowa*, 3:18-cv-00010-CFB (S.D. Iowa) ("*Stark I*"). By stipulation of the parties, the complaint was dismissed without prejudice on May 7, 2018. Stipulation, *Stark I*, ECF No. 17. At the time of the dismissal, Stark was on parole. Stark Dep. 15:13–16:4, ECF No. 31-2 at APP. 22. His parole was revoked after he missed several appointments. Stark Dep. 16:5–22, ECF No. 31-2 at APP. 22. He was rearrested and taken into custody on June 2, 2018. Keokuk Police Dep't Officer's Report, ECF No. 31-2 at APP. 34–35.

This complaint was filed June 28, 2018. ECF No. 1("*Stark II*"). It encompasses the same claims as made in *Stark I. Compare id. with* Compl., *Stark I*, ECF No. 1. At the time this complaint was filed, Stark was an inmate at the Iowa Medical and Classification Center. ECF No. 1 ¶ 12.

At all relevant times, the Lee County Sheriff had a grievance policy "which permits inmates an available means of resolving grievances in an orderly, fair, simple and expeditious method." ECF No. 31-2 at APP. 26. Under the grievance policy, all inmates are first required to attempt to resolve the issue informally. *Id.* Inmates are then required to submit a formal complaint form to the grievance officer. *Id.* at APP. 29. Within seven days, the grievance officer is to appropriately log the grievance. *Id.* at APP. 29–30. Within fourteen days the grievance officer investigates and responds to the grievant. *Id.* at APP. 30. "All grievances shall be processed from initial receipt to final decision within ninety (90) days." *Id.* at APP. 31. The grievant may appeal the grievance officer's response to the jail administrator. *Id.* The jail administrator or designee shall respond in

writing to the appeal within fifteen days. *Id.* The grievance policy contains no time restriction for inmates to initiate the grievance process.

In his response to Defendants' request for admissions, Stark denies he was ever provided a copy of the grievance policy despite his repeated requests to file a grievance. ECF No. 31-2 at APP. 01. He contends all of his requests were ignored. *Id.* He also claims he was retaliated against for making the request. *Id.* He states he also submitted letters regarding his complaints to the Lee County Sheriff and the ombudsman. *Id.* He was then transferred to a different jail and put in solitary for four to six months where he had no access to a grievance process. *Id.*

## III.    DISCUSSION OF APPLICABLE LAW

Stark alleges Defendants violated his free speech rights, rights against unreasonable seizure, and rights to be free from cruel and unusual punishment under both the federal and Iowa constitutions.[2] ECF No. 1 ¶¶ 31–36. Specifically, Stark claims Defendants Sproul and Lee County improperly seized him and were deliberately indifferent to his safety when he was forced to be involved in chasing the robbery suspect. *Id.* He also alleges Defendants Wray, Coppage, Hamelton, Young, and Lee County violated his right to free speech when they sought to prevent him

---

[2] "The Supreme Court of Iowa is the final arbiter of the meaning of the Iowa Constitution, but when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose." *State v. Davis*, 304 N.W.2d 432, 434 (Iowa 1981). Stark's three federal claims are virtually identical to and listed in the same counts as his state constitutional claims. ECF No. 1 ¶¶ 31–39. No party advocates any state provision should be interpreted differently from its federal counterpart. Therefore, the analysis of Stark's federal constitutional claims under § 1983 is equally applicable to his state claims. *See State v. Richardson*, 890 N.W.2d 609, 621 (Iowa 2017) (interpreting "article I, section 17 in the same dual fashion" as federal Eighth Amendment); *State v. Storm*, 898 N.W.2d 140, 147–48 (Iowa 2017) ("The search and seizure provisions of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution are virtually identical."); *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997) ("[T]he Iowa Constitution generally imposes the same restrictions on the regulation of speech as does the federal constitution.").

from talking about his injuries and the robbery chase. *Id.* ¶¶ 37–39. Stark contends these defendants, together with Sproul, also conspired to cover up the robbery chase. *Id.* ¶¶ 40–44. Stark alleges state law negligence claims against the Lee County defendants based on these incidents. *Id.* ¶¶ 45–52. Finally, Stark complains the State of Iowa has been deliberately indifferent to his serious medical needs by failing to treat him for his injuries. *Id.* ¶¶ 53–66 (alleging claims under federal and state constitutions).

Defendants move for summary judgment on the basis that Stark failed to fully exhaust his administrative remedies on all claims as required by 42 U.S.C. § 1997e(a). Defs.' Br. Supp. Mot. Summ. J. 4–6, ECF No. 31-3. They also argue they are entitled to judgment as a matter of law as to all Stark's claims against them. *Id.* at 6–11. For the reasons discussed below, the Court grants summary judgment in part.

### A.    Exhaustion

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007). The burden is on Defendants to raise and prove this affirmative defense. *See id.* at 212.

An inmate is required to exhaust only such remedies as are available. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). A remedy is not "available" to the inmate when 1) the process operates as a simple dead end where the office "disclaims the capacity to consider those petitions;" 2) the administrative scheme is "so opaque that it becomes . . . incapable of use;" or 3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

It is undisputed that during all relevant times, Lee County had a grievance policy for inmates. ECF No. 31-2 at APP. 26–31. Stark asserts he never filed a written grievance about the chase incident, however, because Defendants failed to provide him with a form. *Id.* at APP. 01. He contends he made multiple requests for a grievance form, wrote to the Lee County Sheriff about the incident, and even contacted the state ombudsman about his complaints. *Id.* Instead of receiving a form, he states Defendants retaliated against him by transferring him to a different jail and placing him in solitary for four to six months. *Id.*

Defendants concede "Stark could generate a material issue of fact about whether the Lee County grievance procedure was available to him prior to filing his previous action." Defs.' Reply Br. Supp. Mot. Summ. J. 1, ECF No. 40. Their argument, however, is that in order to satisfy exhaustion, Stark was required to attempt to use the grievance process again before filing this second lawsuit. *Id.* At the time he filed *Stark II*, Stark was represented by legal counsel, was personally familiar with the grievance process at Lee County, and because he was not incarcerated at Lee County, was not subject to any intimidation. ECF No. 31-3 at 6. According to Defendants, "[t]here is no reason in the world why Stark or his counsel could not have utilized the Lee County Inmate Grievance Program between June 2, 2018 when Stark once again achieved prisoner status and June 28, 2018 when he commenced this action." *Id.*

For the following reasons, this argument is not persuasive. First, the grievance policy is ambiguous as to whether Stark would be allowed to grieve if he was no longer incarcerated at Lee County. The grievance policy does not define the term "inmate," and appears to apply to only those currently incarcerated at the jail. *See e.g.* ECF No. 31-2 at APP. 26 ("[A]ll *inmates* must attempt informal resolution prior to filing a written grievance.") (emphasis added); *id.* at APP. 27 ("*Inmates* . . . shall be entitled to file grievances within this program.") (emphasis added); *id.* ("Assistance shall be available to *inmates* who cannot complete the forms themselves.")

8

(emphasis added). Additionally, Defendants do not dispute they originally refused to provide grievance forms to Stark. Once that process was thwarted, Defendants do not explain why the process would be open to Stark when it was previously blocked.

Further, while the grievance policy does not impose any time limit for initially filing a grievance, *see* ECF No. 31-2 at APP. 26–31, Defendants do not suggest what relief might still be available to Stark. The exhaustion process must be able to grant at least some relief. *Ross*, 135 S. Ct. at 1859 (stating exhaustion is required only of those "grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of'") (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Such a late grievance provides the county no meaningful opportunity to address the claims in the grievance. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005) ("[R]equiring *entirely* pointless exhaustion, when no possible relief is available, is more likely to inflame than to 'mollify passions,' and thus is unlikely to 'filter out some frivolous claims.'") (quoting *Booth*, 532 U.S. at 737, and *Porter v. Nussle*, 534 U.S. 516, 525 (2002)). Instead, Defendants' alleged refusal to provide grievance forms eliminated any "fair and full opportunity" for Lee County officials to address the complaint themselves. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (discussing how exhaustion requirements provide "agency a fair and full opportunity to adjudicate their claims").

Finally, requiring continued attempts to grieve a system that previously was "unavailable" does not accomplish any of the benefits of exhaustion in general, which "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Nor does Defendants' argument support the stated purpose of the Lee County's grievance program which is to permit "inmates an available means of resolving grievances in an orderly, fair, simple, and

expeditious method." ECF No. 31-2 at APP. 26. A grievance filed two years after the event occurred is not an expeditious resolution.

Instead, exhaustion is complete once the prison fails to respond and no further remedies were available to the inmate. *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) ("Foulk's testimony suggests that he had exhausted his available administrative remedies because, once MDOC failed to respond to his IRR, no further administrative proceedings were 'available' to him."). Other courts have specifically found the grievance process was not "available" where prison officials fail to respond to an inmate's request for grievance forms. *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utilizing' is not an 'available' remedy under § 1997e(a)."); *Nixon v. Sanders*, 243 F. App'x 197, 199 (8th Cir. 2007) (concluding plaintiff "raised a factual dispute as to whether he was denied the necessary forms to grieve the religious harassment that was the subject of his *Bivens* action"); *see also Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) ("Inmates are excused from exhausting remedies 'when officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures.'") (quoting *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005)).

In light of the above discussion, the Court concludes Defendants have failed to demonstrate the grievance process at Lee County was "available" for Stark to use between the time he dismissed *Stark I* and filed *Stark II*. The Court will not dismiss Stark's claim for failure to exhaust administrative remedies.

## B. First Amendment

In his deposition, Stark recounts he was in his cell on the evening of the robbery chase when Defendants Wray, Hamelton, Coppage, and Young "came in, gloves on, slammed [him] up against the wall, threw [him] in handcuffs." Stark Dep. 50:8–11, ECF No. 37-3 at Pl.'s App. 047;

*see also* ECF No. 1 ¶ 38. Defendants also had a taser pointed at him. Stark Dep. 51:17–18, ECF No. 37-3 at Pl.'s App. 047–048. Throughout the day Stark had been asking to make phone calls regarding back pain but was not allowed to do so. Stark Dep. 51:7–15, ECF No. 37-3 at Pl.'s App. 047. Stark acknowledged he also "might have mentioned that [he was] going to go to the newspaper or [he was] calling the news, and that's when [Defendants] was like, 'Well, you're not calling anybody, how about that.'" Stark Dep. 52:20–23, ECF No. 37-3 at Pl.'s App. 048. When Defendants came to his cell in the evening, "they specifically said, you know, 'This is none of your business, you don't need to talk about it to nobody, anything that you seen, you know, keep to yourself.'" Stark Dep. 51:12–15, ECF No. 37-3 at Pl.'s App. 047.

Stark alleges Defendants' words and actions were an attempt to intimidate Stark into denying he was with Sproul during a dangerous robbery chase and shooting. ECF No. 1 ¶ 38. Defendants do not dispute that they made these statements, only that such action did not violate Stark's free speech rights. ECF No. 31-3 at 7 (arguing Stark's allegations are "clearly baseless" or based on a "fantastic or delusional factual scenario").

"To prevail on a § 1983 claim for retaliation in violation of the First Amendment, [a plaintiff] must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013).

First, speech which criticizes a law enforcement officer is protected under the First Amendment. *See Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017) (quoting cases which acknowledge criticism of police is protected speech).

Stark must next show Defendants "took adverse action against him that would chill a person of ordinary firmness from continuing in the activity." *Santiago*, 707 F.3d at 991. The

question is not whether Stark would have been deterred, but how a reasonable person would have responded. *See Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (noting person of ordinary firmness is objective rather than subjective test). Defendants told Stark this was none of his business and told him to keep what he had seen to himself. Stark Dep. 51:12–15, ECF No. 37-3 at Pl.'s App. 047. These words, in and of themselves, may not have seemed threatening, but when combined with slamming Stark against a wall, placing him in handcuffs, and pointing a taser at him, Stark has at least generated a fact question about what Defendants attempted to convey. "[A] threat of retaliation is sufficient injury" if done in retaliation for an inmate exercising his First Amendment rights. *Santiago*, 707 F.3d at 992.

Finally, the alleged threat must have been "motivated at least in part by the exercise of the protected activity." *Id.* at 991. Defendants assert they entered Stark's cell because "Stark was upset about not being with his brother and commenced banging on the cell door and screaming after lights out." ECF No. 40 at 4. Defendants also argue outside telephone calls were refused because Stark had no money in his account to make any telephone calls. ECF No. 31-3 at 7; ECF No. 40 at 2.

Stark admits he was kicking on the door and screaming after lights out. Stark Dep. 51:19–22, ECF No. 40-1 at 3. Moreover, Stark has no right to unlimited access to the telephone. *See Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989) ("Although in some instances prison inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner, 'subject to rational limitations in the face of legitimate security interest of the penal institution.'") (citation omitted). Nonetheless, "'the court is obligated "to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."'" *United States v. Parker*, 871 F.3d 590, 605

(8th Cir. 2017) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Given the entire context of the interactions with Defendants, it is unclear why it was necessary for multiple officers to respond to the "ruckus" by entering the cell, placing Stark in handcuffs, pointing a taser at him, and telling him not to talk about things he saw earlier in the day. Stark has created a genuine issue of material fact as to whether Defendants' actions and words were motivated, at least in part, by Stark's attempt to make phone calls to the media.

Finally, even if the claim is not frivolous, Defendants argue they are entitled to qualified immunity. ECF No. 31-3 at 7–10. Government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine qualified immunity, a Court must consider "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If there was a constitutional violation, then qualified immunity only shields the officer from liability "if the constitutional right was [not] clearly established at the time of the violation." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019).

Defendants argue they are "entitled to qualified immunity because Stark has no clearly established constitutional right to free phone calls." ECF No. 31-3 at 7. Stark's claim, however, is not based on whether he was required to pay for his telephone calls but instead that

Defendants used intimidating actions and words in order to prevent Stark from speaking out about the robbery chase. ECF No. 1 at 7.

The law of this circuit has "long held" a First Amendment retaliation claim exists where a defendant has made a threat of retaliation for exercising one's First Amendment rights, and "is true especially when the threats are ones of death or serious harm to an inmate's safety." *Santiago*, 707 F.3d at 992. In *Santiago*, the correctional officer implied that if the prisoner plaintiff did not drop his grievance against a second correctional officer, the prisoner "would be found hanging in his cell and that his death would be made to look like a suicide." *Id.* The Court concluded such a threat "issued by a correctional officer tasked with guarding a prisoner's segregated cell, would chill a prisoner of ordinary firmness from engaging in the prison grievance process." *Id.*; *see also Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994) ("[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures.").

On the night Defendants entered Stark's cell, it was clearly established that prisoners had a right to be free from retaliation for exercising their First Amendment rights. Therefore, Defendants are not entitled to qualified immunity on this issue.

The Court denies summary judgment on Stark's free speech claim.

### C. Qualified Immunity as to Defendant Sproul

Stark alleges Sproul's pursuit of the bank robbery suspect while Stark was in the back seat of the law enforcement vehicle without seat belts constituted both an unreasonable seizure and cruel and unusual punishment[3] under both the federal and state constitutions. ECF No. 1 ¶¶ 34–36.

---

[3] The complaint does not clarify Stark's status as a prisoner at Lee County. ECF No. 1 ¶ 13 (alleging "Stark was in the custody of the Sheriff of Lee County"). "The Eighth Amendment does not apply to pretrial detainees, but the Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees." *Christian v. Wagner*, 623 F.3d 608, 613

### 1. Substantive Due Process

The facts of Stark's Fourth and Eighth Amendment claims are the same, and as such, Defendants assert "the analysis of his liability would be the same as a Fourteenth Amendment Substantive due process claim." ECF No. 31-3 at 8. Defendants contend they are entitled to qualified immunity upon this claim. *Id.* at 7–10. The Court first considers what analytical framework should apply to these claims.

With respect to prisoners, substantive due process claims may overlap with Eighth Amendment or Fourth Amendment protections. *See Whitley v. Albers*, 475 U.S. 312, 327 (1986). The Supreme Court has considered a substantive due process claim in the context of a motorcycle passenger killed during a high-speed chase. *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). In determining whether substantive due process was violated, the Court considered how the law enforcement officer "must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* at 853. Because there is no luxury of time to make important decisions, the Supreme Court held "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 854.

As in *Lewis*, Sproul argues "[h]e was confronted with a fluid and dynamic situation where an armed robber might [evade] capture." ECF No. 31-3 at 10. Sproul argues his actions do not shock the conscience, nor were they done with the intent to harm Stark. *Id.* (citing *Neal v. St. Louis*

---

(8th Cir. 2010) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (stating pretrial detainee is "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment").

*Cty. Bd. of Police*, 217 F.3d 955, 958 (8th Cir. 2000) ("In situations where a state actor is afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference.'")).

The "intent-to-harm standard of *Lewis* applies to all § 1983 substantive due process claims based upon the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender." *Helseth v. Burch*, 258 F.3d 867, 871 (8th Cir. 2001) (en banc). However, "all claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Mensie v. Little Rock*, 917 F.3d 685, 688 n.4 (8th Cir. 2019) (recognizing where a narrower constitutional provision applies "'the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process'") (citation omitted). Even *Lewis* distinguishes the facts of a spontaneous high-speed chase with the "custodial situation of a prison, [where] forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis, 523 U.S.* at 851.

Stark did not bring a substantive due process claim but rather states claims based on alleged violations of unreasonable seizure and cruel and unusual punishment. ECF No. 1 ¶¶ 31–36. Given Supreme Court direction, it is appropriate to discuss these claims in the context of the narrower Fourth and Eighth Amendments as opposed to a substantive due process claim.

### 2.     Fourth Amendment

The Fourth Amendment protects a free citizen from law enforcement officials using "excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." *Graham*, 490 U.S. at 388. "[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)). Without intent by Sproul to harm Stark, there can be no Fourth Amendment violation.

Sproul averred it was his intent to observe the situation and provide information to other law enforcement officers if required. Sproul Dep. 57:22–23, ECF No. 31-2 at APP. 41 ("My thought pattern at the time was to be an observer, was to not actively engage in anything, but to see if the bad guy runs out and watch, let the PD know."). Stark provides no evidence to create any issue of material fact that Sproul intended to harm him. Nor is the law so clearly established that Sproul would have known his actions would violate Stark's Fourth Amendment rights. *See Corbitt v. Vickers*, 929 F.3d 1304, 1317 (11th Cir. 2019) ("[W]e are unable to identify any settled Fourth Amendment principle making it obviously clear that volitional conduct which is not intended to harm an already-seized person gives rise to a Fourth Amendment violation."); *see also McCoy v. City of Monticello*, 342 F.3d 842, 847 n.3 (8th Cir. 2003) ("The shooting was unintentional, thereby raising an interesting question of law: after an intentional Fourth Amendment seizure has occurred, does an accidental shooting implicate the Fourth Amendment?"). For this reason, Sproul is entitled to qualified immunity with respect to Stark's Fourth Amendment claim. *See Jackson*, 944 F.3d at 711 (holding qualified immunity shields officer from liability "if the constitutional right was clearly established at the time of the violation").

Stark argues the qualified immunity analysis as applied to claims under the Iowa Constitution is different from federal law. Pl.'s Br. Supp. Resist. Defs.' Mot. Summ. J. 13–14, ECF No. 37-2. Under Iowa law, "[a] defendant who pleads and proves as an affirmative defense that he or she exercised all due care to conform with the requirements of the law is entitled to qualified immunity on an individual's claim for damages for violation of article I, sections 1 and 8 of the Iowa Constitution." *Baldwin v. City of Estherville*, 915 N.W.2d 259, 260–61 (Iowa 2018).

As discussed above, the Court concludes there was no Fourth Amendment violation of Stark because there was no intentional act of excessive force by Sproul to harm him. Stark argues Sproul's intentions are irrelevant because "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." ECF No. 37-2 at 16 (quoting *Graham*, 490 U.S. at 387). While it is irrelevant whether the officer intended to cause the amount of harm deliberately inflicted, the intentions of the officer are relevant to determine whether the officer intended to apply the force or if it was a consequence of a separate, unrelated action. As there was no substantive violation either under state or federal law, it is not necessary to consider whether qualified immunity applies to his state claim. *See Saidu v. City of Des Moines*, No. 18-2793, 2019 WL 6002050, at *2 n.3 (8th Cir. Nov. 13, 2019) (unpublished) (per curiam) (declining to address qualified immunity under either federal law or as set forth in *Baldwin*).

### 3. Eighth Amendment

The analysis is different with respect to Stark's Eighth Amendment claim. Unlike a Fourth Amendment claim, once Stark was in Sproul's custody, the Eighth Amendment required Sproul to protect Stark. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) ("The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that 'it is but just that the public be required

to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'") (internal citations omitted). A prison official violates the Eighth Amendment if the official is deliberately indifferent to the prisoner, that is, if the defendant knew of an excessive risk to the inmate's health or safety, and knowingly disregarded the risk. *Farmer v. Brennan*, 511 U.S. 825, 828, 837 (1994).

A failure to use seatbelts, without more, does not violate the Eighth Amendment. *Spencer v. Knapheide Truck Equip.* Co., 183 F.3d 902, 906 (8th Cir. 1999) (finding policy to purchase patrol wagons without safety restraints constituted "negligence at most"); *see also Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012 ("failure to provide a seatbelt is not, in itself, 'sufficiently serious' to constitute an Eighth Amendment violation").

However, the "failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health." *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008). In *Brown*, the police officer failed to secure the prisoner with a seatbelt even though the prisoner had requested such restraint. *Id.* at 559. Additionally, Brown alleged the law enforcement officer was driving "in excess of the speed limit, following too closely to the lead van, crossing over double-yellow lines, and passing non-convoy cars when the road markings clearly prohibited doing so." *Id.* The prisoner was restrained with "belly chains, handcuffs, leg chains, and a black box covering the handcuffs," which prevented him from bracing himself. *Id.* at 556. The Court of Appeals found this offer of evidence was sufficient to establish a fact question as to whether the officer's actions created a substantial risk of harm to the plaintiff and whether the officer "knew of and disregarded the risk he created." *Id.* at 560. The Court of Appeals also concluded the driver was not entitled to qualified immunity because he had "'fair warning' that driving recklessly while transporting a shackled inmate who

had been denied the use of a seatbelt and ignoring requests to slow down violated the constitutional prohibition against cruel and unusual punishment." *Id.* at 561.

"Clearly established" law, for purposes of qualified immunity, does not require a party to cite a case directly on point or with identical facts, "but 'controlling authority' or 'a robust consensus of cases of persuasive authority' must have put 'the statutory or constitutional question beyond debate' as of the date of the alleged violation." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). *Brown* clearly established that driving recklessly while transporting a shackled inmate who was not using a seatbelt "violated the constitutional prohibition against cruel and unusual punishment." *Brown*, 518 F.3d at 561.

Defendants argue Sproul was not driving recklessly but "used reasonable and necessary evasive action to avoid injury to himself and Stark." ECF No. 31-3 at 10. The record indicates otherwise. In addition to not securing Stark with a seatbelt, Sproul Dep. 11:15–22, ECF No. 31-2 at APP. 37, Stark was in the backseat of the car wearing handcuffs, leg shackles, and his hands were belly chained to his waistline. Sproul Dep. 18:8–24, ECF No. 31-2 at APP. 38. At most, he could only move his hands approximately eight inches in any direction, and had limited ability to brace himself, grab the armrest, seat, or any safety handle. Sproul Dep. 20:8–21:13, ECF No. 31-2 at APP. 38. Sproul "gunned the vehicle over the curb, like floored it, ramped the curb, and then . . . took off straight after the guy." Stark Dep. 36:7–9, ECF No. 37-3 at Pl.'s App. 044. Stark was in the middle of the back seat where he was "getting thrown around," and "going up and down through this field." Stark Dep. 37:6–10, ECF No. 37-3 at Pl.'s App. 044. By Sproul's own account, he drove through an unmaintained empty lot and crossed over ruts and depressions in the ground. Sproul Dep. 69:18–23, ECF No. 37-3 at Pl.'s App. 034–035. After the bank robber shot at Sproul through the windshield, Sproul "turned hard right."

Sproul Dep. 61:23–62:2, ECF No. 37-3 at Pl.'s App. 033. He then "drove around in between trees and up over [a] curb (indicating) and out." Sproul Dep. 62:2–4, ECF No. 37-3 at Pl.'s App. 033. Sproul stated, "I just remember getting the hell out of Dodge." Sproul Dep. 69:25–70:1, ECF No. 37-3 at Pl.'s App. 035.

These facts are sufficient to create a material fact question as to whether Sproul, by engaging in an unrelated pursuit while having a prisoner in the backseat without being secured by a seatbelt and without any way to brace himself, drove in a manner which put Stark at risk of injury and Sproul disregarded the risk. Because it was clearly established at the time that the "failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health," *see Brown*, 518 F.3d at 558, Sproul is not entitled to qualified immunity on this issue. Summary judgment on this issue is denied.

### D. Conspiracy

Stark alleges Defendants Sproul, Wray, Coppage, Hamelton, Young, and Lee County conspired to cover up the robbery chase and to harass Stark after he was released from prison. ECF No. 1 ¶¶ 40–44. Stark now concedes there is insufficient evidence to support the conspiracy claim, and "agrees that Count IV of his complaint should be dismissed." ECF No. 37-2 at 16. Accordingly, this claim is dismissed.

### E. Lee County

"[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable." *Kasiah v. Crowd Sys.*, 915 F.3d 1179, 1186 (8th Cir. 2019) (internal quotations marks and citation omitted). Defendants argue Lee County is entitled to summary judgment because no employee of Lee County is liable for any unconstitutional acts. ECF No. 31-3 at 11. Because the Court has concluded questions of fact remain as to whether some of the

county-employee defendants violated Stark's constitutional rights, Lee County is not entitled to summary judgment on this basis.

### F.     State Law Claims

Stark's state law claims allege Defendants Sproul, Wray, Coppage, Hamelton, Young, and Lee County were negligent toward Stark in the course of their duties. ECF No. 1 ¶¶ 45–52. Defendants do not move for summary judgment on these claims but argue "the Court should decline to continue jurisdiction of the matter." ECF No. 31-3 at 11.

"[D]istrict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Where no claims over which the court had original jurisdiction remain, the district court has the discretion to decline to exercise supplemental jurisdiction over any supplemental claims. 28 U.S.C. § 1367(c)(3); *see also Franklin v. Zain*, 152 F.3d 783, 786 (8th Cir. 1998) ("Unlike a claim over which it has original jurisdiction, the district court may decline to exercise supplemental jurisdiction over a pendent state claim if it has dismissed all claims over which it has original jurisdiction.").

The Court has denied summary judgment as to Stark's First and Eighth Amendment claims. Because these claims are part of the same controversy, it is appropriate to exercise supplemental jurisdiction over Stark's remaining state law claims.

### G.     Motion for Emergency Injunctive Relief

Count VI of Stark's complaint against the State of Iowa alleges he has been denied necessary medical care for his injuries while incarcerated by the State of Iowa.[4]

---

[4] Under the Eleventh Amendment, states and their agencies are immune from being sued in federal court unless Congress has abrogated the State's immunity by some express statutory provision, or

ECF No. 1 ¶¶ 53–68. He alleges the lack of care violates his rights to be free from cruel and unusual punishment as guaranteed in both the United States and Iowa constitutions. *Id.* Stark alleges by refusing and delaying treatment from these injuries, he has experienced ongoing pain and suffering, and "[t]he State of Iowa should be enjoined to require that Stark receive all necessary medical evaluation and treatment, including neck surgery, if recommended by Stark's treating orthopedic surgeon and/or neurosurgeon." *Id.* ¶ 64.

The State of Iowa has answered the complaint but did not respond to the request for emergency injunctive relief. ECF No. 18. In his deposition, however, Stark states he is currently taking pain and anxiety medication, and the Iowa Department of Corrections has agreed to provide him spinal surgery. Stark Dep. 48:6–9, 56:4–25, ECF No. 37-3 at Pl.'s App. 046, 048–049; *see also* ECF No. 37-2 at 6. Further, in three joint status reports made to the Court and submitted by Stark's counsel, "the parties agree that no issues at this time need to be addressed by the court for purposes of [a scheduled Status Conference]." *See* Status Reports, ECF Nos. 23, 25, 29. As it appears Stark is currently receiving appropriate treatment, the request for emergency injunctive relief is denied as moot.

## IV.    SUMMARY AND RULINGS

Defendants' Motion for Summary Judgment, ECF No. 31, is **GRANTED** with respect to Count I (Fourth Amendment) and Count IV (conspiracy). Summary judgment is **DENIED** with respect to all remaining claims in the complaint.

Stark's request for emergency injunctive relief is **DENIED**.

---

the State has consented to suit. *See* U.S. Const. amend. XI; *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The State of Iowa did not file a motion to dismiss on this basis, and the Court takes no action sua sponte.

This case is referred to Magistrate Judge Celeste F. Bremer to conduct a status conference regarding all pretrial details, including setting trial date.

**IT IS SO ORDERED.**

Dated this 13th day of February, 2020.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE